## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS AUSTIN DIVISION

| | | |
|---|---|---|
| MEXICAN AMERICAN LEGISLATIVE CAUCUS, TEXAS HOUSE OF REPRESENTATIVES, | § § § § | |
| Plaintiffs | § § | |
| v. | § § | Civil Action No.:_____ |
| STATE OF TEXAS, GREG ABBOTT, GOVERNOR OF THE STATE OF TEXAS, in his official capacity, and JOHN SCOTT, SECRETARY OF STATE OF TEXAS, in his official capacity | § § § § § § § § | |
| Defendants | § | |

### PLAINTIFF MALC'S ORIGINAL COMPLAINT

Texas has adopted redistricting plans for the Texas House of Representatives, the Texas delegation to the United States House of Representatives, and the Texas State Board of Education. In keeping with a long history of legal violations in the redistricting process, these plans discriminate on the basis of race and impermissibly dilute the vote of Latino populations. While the United States Supreme Court declined to permit federal courts to police partisan gerrymandering because redistricting is, by its nature, inherently political, the Court did not give state legislatures a license to racially discriminate or dilute minority voting power under the guise of mere partisanship. In places where racially polarized voting is the norm, there is a long-standing history of discrimination, and as racially-tinged political speech is increasingly on the rise, it is particularly important to ensure the courts have the ability to review plans for impermissible vote dilution and potentially invidious discrimination. Texas has violated the Equal Protection Clause of the Fourteenth and Fifteenth Amendments of the United States Constitution and Section 2 of the Voting Rights Act consistently every decade when drawing new maps. This

redistricting suit is brought to redress once again Texas's sordid pattern of racial discrimination in redistricting.

Plaintiff requests declaratory and injunctive relief against Defendants in regard to the redistricting plans adopted by the State of Texas for the Texas House of Representatives (Plan H2316); the United States House of Representatives (Plan C2193); and the Texas State Board of Education (Plan E2106) (collectively, "the Plans").

Plaintiff seeks declaratory relief declaring that the Plans were drawn and adopted with the purpose of discriminating on the basis of race in violation of the Fifteenth Amendment and the Equal Protection Clause of the Fourteenth Amendment; that certain districts within the plan, detailed in the ensuing paragraphs, violate Section 2 of the Voting Rights Act on the grounds that they impermissibly dilute the voting power of Latinos and Spanish speakers; that certain districts, detailed in the ensuing paragraphs, manipulate population deviations for impermissible ends, in violation of the Fourteenth Amendment; and that certain districts, detailed in the ensuing paragraphs, constitute an impermissible racial gerrymander on the grounds that race was a predominant factor in their drawing without a sufficiently compelling governmental interest to justify making it such. Plaintiff further seeks injunctive relief to prevent the use of the Plans in upcoming elections.

Population growth in the State over the last decade was overwhelmingly non-Anglo, with communities of color accounting for approximately 95% of the growth in the whole state. In particular, Latinos accounted for approximately 49.5% of all population growth in the state. As a result, Texas gained two additional Congressional seats—the only state in the nation to do so. As a natural consequence of this growth, new Latino and minority opportunity districts could and should have been included in the redistricting plans adopted by the Legislature. The plans adopted

by the State not only failed to increase Latino and minority opportunities for representation, they actually decreased them while increasing the number of districts in which Anglos form a majority of the eligible voter population. This turns the concept of representative democracy on its head. These plans were developed to minimize and limit Latino and minority electoral opportunities and dilute the voting strength of Latino and minority voters.

Latinos, and to an even greater extent Spanish-speaking Latinos, still face phenomenal barriers to equal participation and feel the effects of past and present official discrimination. The Plans further dilute the opportunities for Latinos and the Spanish speaking community to participate in the political process and elect candidates of their choice on the same basis as Anglo citizens, and therefore violate Section 2 of the Voting Rights Act.

The Plans share common tactics for disenfranchising Latino and Spanish speaking voters. For example, they strategically pair areas which grapple with low turnout rates, as a result of historical and current socio-economic conditions, barriers to participation, and discrimination, with areas that have extremely high and extremely polarized Anglo bloc voting to create districts that are nominally majority-minority but do not perform to elect candidates of choice for minority voters. Some districts are overly packed, unnecessarily wasting votes, while other districts crack communities and dilute their voting power. The extent to which each of the Plans goes to avoid creating new electoral opportunities for communities of color, despite these communities accounting for 95% of the growth in the state, is prima facie evident in the shape of certain districts.

Plaintiff also brings this action challenging the plan adopted for Texas House districts (Plan H2316) because the plan strategically employs population variances between districts to gain a racial advantage, in violation of the Fourteenth Amendment.

The shape of many of the districts in the Plans are unexplainable on grounds other than

race, and the Legislature at times explicitly centered race in its redistricting decisions. Because the Legislature drew many of these districts to minimize minority opportunities rather than to comply with the Voting Rights Act, the use of race as a predominant factor in their drawing constitutes an impermissible racial gerrymander.

## PARTIES

1.      Plaintiff, Mexican American Legislative Caucus, Texas House of Representatives (hereinafter MALC), is the nation's oldest and largest Latino legislative caucus.  MALC is a non-profit organization established to serve the members of the Texas House of Representatives and their staff in matters of interest to the Mexican American community of Texas, in order to form a strong and cohesive voice on those matters in the legislative process, including redistricting. MALC's mission includes maintaining and expanding Latino representation across elected offices in Texas. MALC strives to raise the level of Latino engagement in Texas government and politics through policy, education, outreach, organizing, and advocacy. MALC has one or more members who reside in the challenged districts and who have had their ability to elect representatives of their choice injured on account of being Latino and/or being part of the Spanish-speaking community in the affected areas. MALC members representing the challenged districts will have their ability to successfully gain election hindered if the Plans go into effect. MALC members will face increased difficulty advocating for their legislative platforms and raising the level of Latino engagement in Texas government if Latino representation in the Texas Legislature is diminished. Additionally, MALC will have to expend resource, including paid staff time to counteract said reduction in representation, playing defense against policies it opposes instead of expending its resources to proactively enact new policy priorities.

2.      MALC members in challenged districts include:

a. Rep. Ryan Guillen, who resides in Starr County, in SBOE District 3, and is the incumbent State Representative for Texas HD 31.

b. Rep. Abel Herrero, who resides in Nueces County, in Congressional District 27, and is the incumbent State Representative for Texas HD 34.

c. Rep. Alex Dominguez, who resides in Cameron County, in SBOE District 2, and is the incumbent State Representative for HD 37.

d. Rep. Eddie Lucio, who resides in Cameron County, in SBOE District 2, and is the incumbent State Representative for HD 38.

e. Rep. Terry Canales, who resides in Hidalgo County, in CD 15, and is the incumbent State Representative for HD 40.

f. Rep. Eddie Morales, who resides in Maverick County, in CD 23, and is the incumbent State Representative for HD 74.

g. Rep. Mary González, who resides in El Paso County, in CD 23, and is the incumbent State Representative for HD 75.

h. Rep. Claudia Ordaz-Perez, who resides in El Paso County, in CD 16, and is the incumbent State Representative for HD 76.

i. Rep. Lina Ortega, who resides in El Paso County, in CD 16, and is the incumbent State Representative for HD 77.

j. Rep. Joe Moody, who resides in El Paso County, in CD 16, and is the incumbent State Representative for HD 78.

k. Rep. Art Fierro, who resides in El Paso County, in CD 16, and is the incumbent State Representative for HD 79.

l. Rep. Ramon Romero, who resides in Tarrant County, in CD 33, and is the

incumbent State Representative for HD 90.

    m.  Rep. Rafael Anchía, who resides in Dallas County, in CD 33, and is the incumbent State Representative for HD 103.

    n.  Rep. Terry Meza, who resides in Dallas County, in CD 6, and is the incumbent State Representative for HD 105.

    o.  Rep. Armando Walle, who resides in Harris County, in CD 29 and SBOE District 4, and is the incumbent State Representative for HD 140.

    p.  Rep. Christina Morales, who resides in Harris County, in CD 18 and SBOE District 4, and is the incumbent State Representative for HD 145.

    q.  Rep. Penny Morales Shaw, who resides in Harris County, in CD 18 and SBOE District 4, and is the incumbent State Representative for HD 148.

**3.**    Defendant State of Texas is a political subdivision covered under the provisions of the Voting Rights Act and responsible for the actions of its officials with regard to state-wide redistricting.

**4.**    Defendant Greg Abbott is the Governor of the State of Texas. Pursuant to Article Four Section 1 of the Texas Constitution, he is the chief executive officer of the Defendant State of Texas. His duties include ordering the elections for state offices and the United States House of Representatives. He is sued in his official capacity. He may be served at the Office of the Governor, State Insurance Building, 1100 San Jacinto, Austin, Texas 78701.

**5.**    Defendant John Scott is the current Texas Secretary of State, appointed by Governor Greg Abbott on October 21, 2021. The Secretary of State is the chief election officer of this state. He supervises elections and has constitutional and statutory duties associated with redistricting and apportionment, including advising election authorities on boundaries of districts, setting election deadlines for new districts, and enforcement of certain election rules and laws. He is sued in his

official capacity. He may be served at 1019 Brazos Street, Austin, Texas 78701.

## JURISDICTION AND VENUE

**6.**     Plaintiff's Complaint arises under the United States Constitution and federal statutes. This Court has jurisdiction over this action under 28 U.S.C §§ 1331, 1343(a)(3) and (5), and 1988.

**7.**     Venue is proper in this Court pursuant to 28 U.S.C § 1391(b).

**8.**     Plaintiff seeks declaratory and injunctive relief pursuant to 28 U.S.C §§ 2201 and 2202.

## FACTS

**A. The 2020 Census revealed dramatic growth of the Latino population in Texas, but nevertheless still produced an undercount of Latinos and Spanish speakers.**

**9.**     On August 12, 2021, the United States Department of Commerce and the United States Census Bureau released to the State of Texas the population data gathered during the 2020 decennial Census. The information released to the State of Texas showed the population of Texas had increased by about 15.9%—from 25,145,561 in 2010 to 29,145,505 in 2020.  Overall, Texans of color accounted for 95% of the state's population growth.

**10.**     According to the 2020 Census, the Hispanic population of Texas grew to 11,441,717 from 9,460,921 in the 2010 Census. This was an increase of about 20.9%. Moreover, according to the 2020 Census, Hispanic growth accounted for about 49.5% of the overall growth of Texas.

**11.**     Texas gained the most residents of any state since 2010, and its Hispanic population is now nearly as large as the non-Hispanic white population, with just half a percentage point separating them. Non-Hispanic white Texans now make up just 39.8% of the state's population – down from 45% in 2010. Meanwhile, the share of Hispanic Texans has grown to 39.3%. Indeed, Texas gained nearly 11 Hispanic residents for every additional white resident since 2010. The total population numbers released to the State of Texas by the Census Bureau were used as the measure for population for purposes of the Plans.

12.     Historically, there has never been a completely accurate census in the United States. Moreover, the undercount of population has affected racial and ethnic minorities more than whites. That is, while various groups and individuals have not been counted from time to time, among certain groups, *e.g.* Blacks and Latinos, the level of undercount has consistently been more severe than with Anglos. This disparate impact of the undercount is often referred to as the "differential undercount." Generally, American censuses result in more accurate counts for Anglos than they do for racial and ethnic minorities. *See* National Research Council, "Modernizing the U.S. Census" 32, 33 (Barry Edmonston & Charles Schutze eds., 1995).

13.     The Census Bureau has recognized that in Texas, certain populations are more difficult to count than other populations. For example, people in poorer urban communities are harder to count, as are people who live in poor suburban unincorporated subdivisions primarily located along the Texas-Mexican border in areas often referred to as "colonias." In Texas, this means an undercount of racial and ethnic minorities.

14.     Language barriers exacerbate undercounts. As a result, areas with low Limited English Proficiency, including those areas along the Texas-Mexico border, are not accurately reflected in official Census data. The Texas Demographic Center—the official body tasked with conducting demographic work on behalf of the State of Texas—has acknowledged a likely undercount in Latino communities in Texas, and particularly those along the border.

15.     For example, Congressional District 23 had a Census self-response rate of 57.2%, lower than Texas's state average self-response rate of 62.8%. Within the currently existing CD-23 boundaries, self-response rates varied greatly. The predominantly Anglo census tracts of CD-23 in Bexar County had self-response rates on average above 70%. Conversely, heavily Latino areas along the border had average rates below 40%, with some areas having rates in the teens. Self-

response to the Census was particularly important this decade due to the limitations the COVID-19 pandemic placed on in-person enumeration.

16.     Despite repeated warnings about the likely impact of not investing in Census complete count efforts, the State of Texas was one of only three states to not form a complete count committee or appropriate state funding to facilitate a complete count. This had the predictable result of exacerbating an undercount in the state.

17.     As a natural result of using data which incorporates an undercount, there is a built-in vulnerability to diluting the voting power of Latinos along the border or in urban counties because more outside populations must be added in to equalize the population totals in those districts.

18.     The fact that border-based districts started from an undercounted baseline, thus making them more susceptible to dilution, is well-known to Texas legislators and third-party map drawers. Representatives of the Texas Demographic Center and others repeatedly addressed likely undercounts in public hearings at the legislature in advance of the release of Census results.

**B.  Texas has a long and notorious history of discriminating when drawing district lines.**

19.     "[I]n every redistricting cycle since 1970, Texas has been found to have violated the Voting Rights Act with racially gerrymandered districts." *Veasey v. Abbott*, 830 F.3d 216, 240 (5th Cir. 2016) (citing *Veasey v. Perry*, 71 F. Supp. 3d 627, 636 & n.23 (W.D. Tex. 2014) (collecting cases)); Expert Report of Dr. Allan J. Lichtman at 19, *Perez v. Abbott*, No. 5:11-cv-00360-OLG (W.D. Tex. May 26, 2017), ("Lichtman Report").

20.     In 2006, the U.S. Supreme Court held that Texas had violated the Voting Rights Act by attempting to redraw a congressional district in order to reduce the voting strength of Latino voters. The Court found that the Legislature's action "bears the mark of intentional discrimination that could give rise to an equal protection violation." *League of United Latin Am. Citizens v.*

*Perry*, 548 U.S. 399, 440 (2006). "In response, Texas sought to undermine [the Supreme] Court's order by curtailing early voting in the district but was blocked by an action to enforce the § 5 preclearance requirement." *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 574 (2013) (Ginsburg, J., dissenting); see Order, *League of United Latin American Citizens v. Texas, No.* 06–cv–1046 (W.D. Tex. Dec. 8, 2006), ECF No. 8.

21.     In the 2011 cycle, another federal court found that Texas created redistricting plans with a discriminatory purpose. *See Texas v. United States*, 887 F. Supp. 2d 133, 159-66 (D.D.C. 2012), vacated and remanded on other grounds, 570 U.S. 928 (2013).

22.     In 2018, the U.S. Supreme Court found that the Texas Legislature had unconstitutionally racially gerrymandered a Texas House of Representatives district in 2013. *See Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018).

23.     During the 87th Regular Session of the Texas Legislature, Senator Joan Huffman (Chair of the Texas Senate Select Committee on Redistricting) introduced a plan to reorganize the state's appellate judicial courts. After recent electoral successes by minority candidates and minority candidates of choice, the Bill, SB 11, would have cut the number of effective minority opportunity seats by over 20%, from 50% (still underrepresented from a proportional basis) all the way down to 28.5%. After public outcry from both civil rights organizations and members of the state judiciary, Senator Huffman eventually pulled down the Bill.

**C. The sequence of events leading to the enactment of Congressional District Plan C2193 bears the indicia of intentional discrimination.**

   **1. Pre-map release hearings were mere lip service to deliberative democracy because there was neither updated Census data nor map proposals to review, and ultimately the Texas Legislature ignored all comments and data gathered.**

24.     At various points in 2019, 2020, and early 2021, the Texas House of Representatives Redistricting Committee (the House Committee) and the Texas Senate Special Committee on

Redistricting (the Senate Committee) held hearings to receive public comments on the prospective 2021 redistricting process.

25.     These pre-map field hearings were a strategy employed last redistricting cycle by the Legislature, and a federal court commented that, because they occurred prior to the release of Census data and the release of proposed maps, they "were of limited usefulness in terms of obtaining meaningful public input for legislators, and there is little indication that the . . . Legislature or the map drawers paid much attention to the public testimony received at these hearings." *Perez v. Abbott*, 253 F. Supp. 3d 864, 960 (W.D. Tex. 2017); *see also Perez v. Abbott*, 390 F. Supp. 3d 803, 821 n.14 (W.D. Tex. 2019) ("[The Legislature] had hearings before a census map was released—census data was released. So that was of no value to anybody.").

26.     The most common theme from public testimony during these pre-map hearings was that the public wanted more transparency and fairness in the process, and increased opportunities for input and participation once maps had actually been produced, in order to have a meaningful chance to weigh in on the proposed maps. Approximately two hundred and thirty (230) individuals testified at a hearing that they wished for a transparent and open redistricting process, with approximately one hundred and twelve (112) specifically asking for public hearings on maps with ample time to review the maps before they were voted on. Additionally, hundreds of written comments were submitted voicing these same demands.

27.     Over fifty (50) civil rights and community organizations wrote to the House and Senate Committees to demand a fair and transparent process. Specific demands included a minimum of five (5) day's notice before any hearing; to hold at least five (5) hearings on each map to correspond to the five general geographic regions of the state; and to provide individuals with multiple options for participating a hearing.

28.     Despite these pleas for transparency and input, the Legislature reverted to the same process it used when passing maps in 2011—one which was marked by "[t]he exclusion of minority member and public input despite the minority population growth, the misleading information, the secrecy and closed process, and the rushed process." *Perez v. Abbott*, 253 F. Supp. 3d 864, 961 (W.D. Tex. 2017).

> **2.     The adoption of Plan C2193 was irregular, truncated, and designed to eliminate transparency and deliberation.**

29.     Senator Joan Huffman, the Chair of the Senate Committee, filed Senate Bill 6 ("SB 6") on September 27, 2021. That same day it was referred to the Senate Committee.

30.     Just after 2:00 p.m. on September 27, 2021, the Senate Committee posted a notice for a single hearing on SB 6 to be held on September 30, 2021 at 9:00 a.m. This provided members of the public with only sixty-seven (67) hours, less than three days, to review and analyze the map and make arrangements to be in Austin in person at the Capitol at 9:00 a.m. on a Thursday.

31.     Sixty (60) individuals testified or registered in opposition to SB 6; only one (1) individual testified or registered in favor of the Bill.

32.     Individuals testified at length on the negative impacts SB 6 (at that time Plan C2101) would have on minority communities across the state, providing specific information on demographic and community impacts to demonstrate that the map split apart communities of color, diminished the voting strength of Latinos in CD 23 and elsewhere, and failed to draw any new Latino or minority opportunity districts despite communities of color accounting for 95% of the growth in the State. They critiqued the fact that, despite gaining two Congressional seats entirely on the back of minority growth in the state, SB 6 created two new Anglo majority districts—one majority Anglo Democratic district, and one majority Anglo Republican district.

33.     At the hearing, Senator Huffman indicated that she would hold a separate hearing to

consider committee amendments from members of the Senate Committee, vote on those amendments, and vote on the map as a whole.

**34.**     The Senate Committee posted a notice at approximately 8 p.m. on September 30, 2021 for the hearing on committee amendments to be held on October 4, 2021 at 9 a.m. The one and only hearing in the House Committee on the proposed Texas House of Representatives map (HB 1) was scheduled for the exact same time.

**35.**     At the hearing, twenty-three (23) individuals once again testified in opposition to the Bill as a whole, and zero (0) individuals testified in favor of it.

**36.**     Senator Zaffirini offered a committee amendment (Plan C2109) which only affected the boundaries between CD 16 (fully contained in El Paso) and CD 23 and would have raised the 2020 and 2018 Spanish Surname Voter Registration levels to above 50% (50.3% and 50.7% respectively). This amendment was opposed by the Chair, Sen. Huffman, and voted down by the committee.

**37.**     Senator Zaffirini offered another similar amendment (Plan C2110) which made even fewer changes between CD 16 and CD 23, but which would have raised the SSVR in CD 23 to 50.0% in 2020 and 50.5% in 2018. Chair Huffman opposed the amendment, and it too was voted down.

**38.**     Ensuring that public testimony from that day could not be incorporated into the map, the Senate Committee voted out the committee substitute for SB 6 that same day, with no minority Senator voting in favor of it.

**39.**     On October 8, 2021, the Texas Senate suspended Rule 7.12 of the Texas Senate Rules in order to consider SB 6 on the Senate floor without printing of the Committee Report on the bill.

**40.**     Multiple amendments were offered on the Senate floor which would have ameliorated the dilution of Latino voting strength in the proposed plan, yet none were accepted despite being

supported by every minority Senator.

**41.**    The Senate passed the Committee Substitute for SB 6 through on second reading with every minority Senator opposing the Bill.

**42.**    To bypass the Texas Constitutional rule that bills be read on three separate days, the Senate adjourned for one minute at 2:27 p.m. on October 8, 2021, then reconvened at 2:28 p.m. to begin a "new legislative day." The Senate then proceeded to engross CSSB 6 and send it to the House on that same day, where it was referred to the House Committee.

**43.**    After repeatedly implying that the House would not take up consideration of a Congressional map until after Texas House and Texas Senate maps had been passed, the House Committee, chaired by Representative Todd Hunter, abruptly posted at 9:41 a.m. on October 12, 2021 notice for a hearing on the Senate's Congressional proposal to be held at 10:00 a.m. the next day.

**44.**    No advance notice of this hearing was given to minority members of the House Committee, and it was posted on the same day the House was debating HB 1 (the proposed map for the Texas House of Representatives) on the House floor.

**45.**    If an individual was diligently monitoring the legislature for any posting of notice for a hearing, they would have only had 24 hours and 19 minutes notice of the House Committee hearing on Congressional maps. The House offered an option to register to testify virtually; however, there was only a twelve (12) hour window to register from the time the notice was posted. In addition, the option to register and testify virtually was not feasible for many minority communities across the state who continue to be on the far end of the digital divide.

**46.**    Individuals who needed language interpretation assistance at the House hearing were only provided an eight hour window to request assistance. At least one individual who needed

interpretation assistance was unable to participate in the hearing because they missed the window for requesting assistance.

47.   No instructions or timeline was provided for members of the House Committee to submit proposed amendments, and no information was provided on whether there would be any votes in Committee.

48.   Despite only having twenty-four hour's notice, ninety-three (93) individuals testified or registered in opposition to SB 6 at the House Committee hearing. Only one (1) individual testified or registered in favor of the Bill.

49.   As he had done in hearings and on the floor when describing the Texas House and Texas Senate redistricting plans, Chair Hunter highlighted the demographic effects of the Bill— minimizing its discriminatory impact—by inaccurately basing his assessment of minority opportunity districts on Voting Age Population ("VAP"), despite it having been repeatedly pointed out that Citizen Voting Age Population ("CVAP"), particularly for Latino communities, is a more indicative measure and preferred by courts. In his layout of all redistricting plans (Congressional, Senate, House, State Board of Education) both in Committee and on the Floor, Chair Hunter made the number of majority minority VAP districts a centerpiece of his presentation.

50.   At the hearing, Chair Hunter announced that he would not be allowing members to offer any committee amendments, and that they would vote the Bill out that same day.

51.   CSSB 6 was voted out of the House Committee in the evening on the same day it was heard, ensuring that public testimony could not be incorporated.

52.   Despite acknowledgment, including by Representatives from both political parties in private conversations and debate on the Texas House floor, that the map and public testimony on

the map revealed potential legal problems, no amendments were accepted on the House floor which would have mitigated these issues.

53.    It was openly acknowledged that the way the map split apart Asian American and Pacific Islander communities in Fort Bend County was problematic. Amendments were offered which would have alleviated this problem, yet none were accepted.

54.    Multiple amendments were offered which would have ameliorated the retrogression of Latino voting power in CD 23 as well, but none were accepted.

55.    Amendments which would have drawn new additional Latino opportunity districts, to reflect that Latinos were the major driving force behind the growth of the state, were similarly rejected. When questioned on the floor as to why he opposed this specific effort, Representative Jetton of House District 26—one of the Representatives who took a lead on redistricting debates—offered a scant defense of his position, repeatedly stating that he was "not advised" on the needs of north Texas Latino communities of interest.

56.    Obviously pretextual reasons for opposing the creation of new opportunity districts were proffered on the House floor. For instance, an amendment which would have created a new Latino majority Congressional district in Dallas was opposed on the basis that it slightly lowered the non-Anglo population in an adjacent district. When it was rebutted that this was the natural result of creating an entirely new minority opportunity district, the response was "not advised."

57.    Unfortunately, this kind of short and frivolous defense in opposition to these ameliorating amendments was common throughout both the House Committee and Floor proceedings during the deliberation of SB 6.

58.    Conversely, amendments that furthered the political ambitions of members of the body received extended consideration time, and favorable passage. For example, over an hour was

spent on Representative Toth's amendment that drew his residence out of CD 2—represented by Congressman Dan Crenshaw—and into CD 8—a soon-to-be open congressional seat. Such consideration was not given to amendments that sought to remedy the intentional dilution of minority votes across the state.

59.     Early in the midnight hours of October 17, 2021, the House passed SB 6 on third reading. Taking issue with various changes made by the House to SB 6, the Senate did not concur. Just before 1:50 am that evening, a conference committee was appointed to adjust the differences between the upper and lower chambers on the Bill.

60.     In a departure from ordinary procedure, the House granted the request of the Senate for the appointment of a conference committee on SB 6 after the House had recessed pending administrative matters and after the members had left the floor. While it is not unusual for the House to stand in recess pending administrative matters, generally on bills of this nature, motions to grant a conference committee and to appoint conferees is done with the membership present because members may want to object to the granting of the Senate's request for a conference committee. The appointment of a conference can include important substantive components, such as instructions on how far the committee can veer from the House's engrossed legislation. Here, however, members did not have that opportunity because the conference committee at issue was appointed when members were not present.

61.     The conference report contained changes that were not present in either the Senate or House passed version of SB 6. This deviation from permitted legislative procedure gave rise to a point of order against further consideration of the conference committee report on SB 6 under Rule 13, Section 9(d)(1) of the House rules on the grounds that the conferees exceeded their authority without permission.

62.     Specifically, Representative Anchía noted that the structure of CD 20 was the same in both the Senate and House versions of SB 6 and, thus, was not a matter of disagreement between the two houses, as the House Rules require. Indeed, the report's swap of territory between CD 35 and CD 20 to resolve disagreement over the latter was not permitted under the rule because it was not "essential to the effective resolving of the matter in disagreement."

63.     Representative Anchía pointed out that Senator Huffman had already explicitly stated on the Senate floor during the layout of the SB 6 conference committee report that the changes made between CD 35 and CD 20 were made at the behest of a Member of the Texas House of Representatives so that his residence could be in a particular district. Therefore, these were new, distinct changes to the map requiring permission by resolution under Rule 13, Section 9(f) of the Texas House Rules.

64.     The Texas House Parliamentarian overruled this point of order, pretextually relying on a single instance from over a century ago related to the U.S. House of Representative debates to justify ignoring proceedings on the Senate floor, while ignoring the hard evidence that the changes in the conference committee report were not essential to resolving a disagreement between plans, as explicitly required in the House Rule governing redistricting conference committee reports.

65.     Upon adoption of the conference committee report by both Houses, the report was then sent to the Governor's office.

### 3.     The adoption of Plan H2316 was also irregular, truncated, and designed to eliminate transparency and deliberation.

66.     The efforts of the Texas Legislature to circumvent debate and maintain a shadowy veil over the origins of the proposed map for the House Districts were similarly problematic. Indeed, it appears that the leadership of the Texas House of Representatives worked to ensure a swift and non-deliberative process that essentially rubber-stamped maps drawn in secret.

67.     Although redistricting data was not loaded into the Texas Legislature's map system until September 1, 2021, Chair Hunter sent a letter to members of the House on September 9, 2021 informing them that they had only ten (10) days to submit any proposed maps to the House Committee for consideration.

68.     Plaintiff MALC, along with the Texas Legislative Black Caucus and the Texas Legislative Study Group sent a letter requesting more time to work with members on proposed maps. This request was ignored.

69.     While still telling some members of the Texas House that no map existed yet, Chairman Hunter began privately showing portions of the map to members on Wednesday, September 29, 2021.

70.     Chairman Todd Hunter then publicly revealed his proposed map for redistricting the Texas House on Thursday, September 30, 2021, with the release of House Bill 1 ("HB 1"). At the same time, Chairman Hunter posted a public notice to hear public testimony on the following Monday, October 4, 2021 at 9:00 a.m. Chairman Hunter required all proposed amendments to HB 1 by members of the Committee be delivered by 12:00 p.m. on October 4, 2021, leaving members of the Committee who had no prior knowledge of the maps with grossly insufficient time to analyze the map and prepare amendments.

71.     On Friday, October 1, 2021, members of the House Committee who belong to the Mexican American Legislative Caucus and Texas Legislative Black Caucus sent a letter to Chair Hunter in response to the arbitrary committee amendment deadline. Through this letter, these members requested an October 11, 2021 committee amendment deadline and an opportunity to allow for invited testimony to provide voting rights experts sufficient time to analyze the proposed maps.

72.     Chair Hunter denied both requests. It is extremely common practice to allow members of

the Committee to invite expert witnesses, who traditionally testify first and are not bound by the same time limitations imposed on other witnesses. For instance, the Senate Committee allowed invited testifiers from the Mexican American Legal Defense and Education Fund, the Texas NAACP, LULAC, and the Brennan Center.

73.     After only three calendar days' notice, only one of which was a business day, the House Committee held a sole public hearing to discuss and deliberate HB 1. In addition to not allowing invited testimony, the House Committee did not even have state resource witnesses from the Texas Legislative Conference or the Office of the Attorney General available to answer questions—an almost unheard of departure from ordinary committee proceedings, especially for a bill of this magnitude.

74.     Repeated inquiries were made from minority members of the Committee to clarify the timeline on which amendments would be considered and voted on, yet the Committee provided no concrete information.

75.     At the hearing, in another extraordinary move, the entire layout of the Bill—including the author's presentation and all questions from other members—was limited to only one hour. The author, Chair Hunter, did not allow several of the Latino and African-American members of the Committee to ask any questions at all despite their requests to do so, yet every Anglo member of the Committee, regardless of partisanship, who sought to ask questions was able to do so.

76.     After public testimony, Chair Hunter forced members to vote on committee amendments (which had just been distributed hours before) and the Bill itself as part of the same hearing. Given the importance and magnitude of the legislation, this time frame for passage of the proposed Bill was unnecessarily and irregularly truncated.

77.     When an African-American member of the Committee objected to this procedure, on the

grounds that there had been insufficient time to review the amendments, these objections were ignored. Then, remarkably, when a non-controversial amendment from a Latino member of the Committee which would have only made minor agreed-to changes to a few predominantly Latino districts was offered, Chairman Hunter refused to support the amendment on the grounds that there had been insufficient time to review its impacts.

78.     The Texas House of Representatives Calendars Committee set HB 1 for floor consideration on October 12, 2021 and required all amendments to be filed by 6:00 p.m on Sunday, October 10, 2021. Again, given the importance and magnitude of the legislation, the time to provide meaningful review and amendments to the legislation was unnecessarily and irregularly truncated.

79.     On October 12, 2021, the Texas House of Representatives again truncated debate and deliberation over HB 1. Chairman Hunter only allowed one hour for his layout of the proposed maps for the Texas House and truncated debate by refusing to answer questions beyond that time period in any reasonable manner. A majority of the Legislature voted down minority members' motions for additional extensions of time. Further, instead of recessing so that deliberation could occur during normal working hours, the House leadership ensured that HB 1 was passed under the cover of darkness and voted on at approximately 3:40 a.m. in the morning on October 13, 2021. HB 1 passed the Texas House adopting Plan H2316.

80.     On information and belief, certain legislators representing minority opportunity districts were pressured into voting for Plan H2316 with implications that their districts would be negatively impacted if they did not do so.

81.     The Texas Senate received HB 1 that same day and the Bill was scheduled for a public hearing on October 15, 2021. True to form, the Senate committee voted HB 1 out the same day it

heard public testimony. and again suspended the body's institutional rules—adopted to ensure transparency and effective deliberation—to ensure expedited passage of HB 1 on that same day.

### 4. The adoption of State Board of Education Plan E2106 suffered from the same anti-democratic defects.

82.    The process through which the Legislature passed Senate Bill 7 ("SB 7")—the new State Board of Education districts—was also truncated and opaque. Once again, the Senate suspended Senate Rule 7.12(a) to consider SB 7 on the floor on an expedited basis and both required readings post-committee were had on the same day.

83.    Once introduced in the Texas House, only one public hearing was held and SB 7 was voted out of committee that same day. Chair Hunter declined to answer any substantive questions on the Bill, citing the fact that it had originated in the Senate and he did not have information on the map beyond that.

84.    Upon being fast-tracked to the House floor, members of the body asked many questions of Chair Hunter to elucidate whether changes were required to adhere to protections afforded under the Constitution and the Voting Rights Act. Instead of providing constructive insight, Chair Hunter purposefully stood at the podium with a single piece of paper and repeatedly stated that he could not answer the inquiries because of his lack of knowledge or understanding of the Senate's drafting or adoption process.

85.    Throughout the bicameral process, pleas from legislators and the general public for more time to consider and analyze the maps as proposed were wholly ignored. Indeed, of the five amendments offered, three were offered by Latino legislators and two by Anglo legislators. Those offered by the Anglo legislators were accepted; those offered by the Latino legislators were not.

### D. The Plans violate the Voting Rights Act in multiple districts and regions.

86.     Despite Latinos accounting for a full half of all growth in the State, the adopted State House, Congressional, and State Board of Education all boldly reduce Latino representation across the state, denying Latinos an equal opportunity to participate in the political process and elect candidates of their choice. The systematic dilution of voting power in certain regions, particularly when taken together with current and historical barriers to participation, also deprive Spanish language communities of the equal opportunity to elect candidates of their choice, in violation of explicit language in Section 2 of the Voting Rights Act.

### 1. House of Representatives Redistricting Plan H2136 is discriminatory.

**a. The configuration and systemic overpopulation of Texas House districts in El Paso, in particular the consolidation of House Districts 76 and 77, dilutes the voting power of cohesive Latino communities and eliminates a performing Latino opportunity district in violation of the Voting Rights Act.**

87.     Under the benchmark plan, El Paso County contains five whole districts within its boundaries.

88.     Every El Paso district in the benchmark is a performing Latino opportunity district, with Hispanic Citizen Voting Age Population ("HCVAP") percentages, Spanish Surname Voter Registration ("SSVR") percentages from the 2020 General Election, and Spanish Surname Turnout ("SSTO") (the percentage of the overall turnout attributable to individuals with Spanish surnames) percentages from the 2020 General Election as represented below:

| DISTRICT | HCVAP | SSVR | SSTO |
|---|---|---|---|
| 75 | 89.4% | 76.6% | 75.9% |
| 76 | 85.8% | 79.7% | 80.1% |
| 77 | 73.3% | 62.4% | 60.7% |
| 78 | 65.4% | 53.2% | 52.7% |

| 79 | 79.2% | 69.5% | 70.6% |

**89.**     Plan H2316 entirely removes HD 76 from El Paso and moves it to Fort Bend County where it has numbers less than 20% in all three of the measures of Latino voting power listed above.

**90.**     This wholesale removal of an effective and longstanding Latino opportunity district cannot be justified.

**91.**     The population of El Paso county divided by the ideal district size for Texas House districts (194,303) indicates that El Paso County on its own has enough population for 4.46 ideal sized districts, meaning that ideally (and under a strict construction of the Texas Constitution's own county line rule, Texas Const. Art. III § 26—which rule must yield to federal law but which otherwise controls), it should have at least four whole districts and comprise roughly half (89,379 total population) of a fifth district. Yet, the Legislature systematically deprived El Pasoans of representation in a fifth partial district.

**92.**     The Texas Legislature jumped through hoops and over hurdles to avoid giving Latinos in El Paso equal representation in the State House.

**93.**     In particular, H2316 under-populates to the extreme every single Anglo majority district in West Texas (average district is underpopulated down to -4.1% below ideal), while it overpopulates Latino majority districts to the extreme (average district size is overpopulated up to +4.3% above ideal). The pernicious effect is obvious: minimized representation for Latinos in the area and maximized representation for Anglos. H2316 avoids eliminating Anglo majority districts or pairing incumbent Anglo representatives and does so at the expense of Latino opportunity.

**94.**     Multiple configurations of Texas House districts exist, and were presented to the

legislature, which would maintain four seats wholly contained within El Paso and have a fifth seat anchored with at least half of its population in El Paso and which does not extend all the way into Maverick County (roughly 500 miles away).

95.     El Paso is a cohesive Latino community with identifiable communities of interest. Plan H2316 deprives these communities of equal representation.

> **b. Texas House District 31 has been drawn to dilute the voting power of Latinos and Spanish language communities in border counties such that extreme Anglo bloc voting from counties to the North prevents them from electing the candidate of their choice.**

96.     In its current form, HD 31 is a performing Latino and Spanish language opportunity district which consistently elects the Latino and Spanish language community candidate of choice.

97.     Under the benchmark plan, HD 31 is 77.2% HCVAP; had SSVR of 74.1% in the 2020 General Election; and SSTO of 68.7% in the same election.

98.     On information and belief, under the benchmark plan, the most recent American Community Survey (ACS) data indicates that a majority (roughly 55%) of the citizen voting age population in HD 31 speaks Spanish at home.

99.     Under Plan H2316, the HCVAP in HD 31 drops to 66.6% (-10.6); the SSVR for 2020 General Election drops to 63.9% (-10.2); and the SSTO drops to 56.3% (-12.4).

100.    On information and belief, under Plan H2316, the most recent ACS data indicates that the percentage of the citizen voting age population that speaks Spanish at home in HD 31 would drop below a majority, to roughly 49% (-6).

101.    Under Plan H2316, due to the dilution of Latino and Spanish community voting strength coupled with the inclusion of new high Anglo turnout counties with extreme Anglo bloc voting, such as Wilson and Karnes Counties, the Latino and Spanish language community candidate of choice would be practically unable to win an election in HD 31.

**102.** Latino and Spanish language voters are sufficiently numerous and geographically compact to form a majority of the voting population in a reconfigured HD 31.

        **c.** **A late night amendment to Texas House District 37, passed against the will of every member whose district was affected by the Amendment, diluted the voting power of Latinos and Spanish speakers in portions of Cameron County while impermissibly packing HD 38.**

**103.** During late night debate on the House Floor, Plan H2308 (an amendment to an amendment to Plan 2316) was offered which changed the composition of districts in Cameron and Hidalgo counties. The Amendment was opposed by every Representative whose district was affected, yet passed over their objection.

**104.** Currently HDs 35, 37, and 38, are wholly contained in Cameron and Hidalgo counties in the benchmark plan, and all consistently elect the candidate of choice for Latinos and the Spanish language community.

**105.** Plan H2316 (which incorporated the amendment) dramatically changed these three districts to unnecessarily pack HD 38, crack apart communities of interest, and severely dilute the ability of Latinos and the Spanish language community to elect candidates of their choice in HD 37.

**106.** Under the benchmark, HD 37 is 85.7% HCVAP; had 78.9% SSVR in the 2020 General Election; and 74.1% SSTO in the 2020 General Election.

**107.** On information and belief, under the benchmark, the most recent American Community Survey (ACS) data indicates that a majority (roughly 59%) of the citizen voting age population in HD 37 speaks Spanish at home.

**108.** Under Plan H2316, the HCVAP would drop to 77.8% (-7.9); SSVR in the 2020 General to 70.5% (-8.4); and SSTO in the 2020 General to 65.8% (-8.3).

**109.** On information and belief, under Plan H2316, the most recent American Community Survey (ACS) data indicates that the percentage of the citizen voting age population that speaks

Spanish at home in HD 37 would drop below a majority, to roughly 44.2% (-14.8).

**110.**   Due to the systematic arrangement of high turnout, extreme Anglo bloc voting, less Spanish-speaking areas in HD 37, Latinos and the Spanish language community would face significant hurdles to electing the candidate of their choice for Representative.

**111.**   The arrangement of HD 37 prior to the Plan H2308 Amendment would have kept the district as a performing Latino and Spanish language opportunity district, and Latinos and Spanish language voters are sufficiently numerous and geographically compact to form the majority of the eligible voting population in HD 37.

### d.  Plan H2316 severely retrogresses Latino and the Spanish language community's voting power in Texas House District 80.

**112.**   Texas House District 80 has long been a performing Latino and Spanish language community opportunity district which consistently elects the candidate of choice for those communities. Plan H2316 undermines the district and creates substantial barriers for those communities by bringing in high turnout, extremely polarized Anglo regions.

**113.**   Under the benchmark plan, HD 80 is 86.2% HCVAP; had 2020 General Election SSVR of 80.6%; and 2020 General Election SSTO of 76.5%.

**114.**   On information and belief, under the benchmark plan, the most recent American Community Survey (ACS) data indicates that approximately 64.8% of the citizen voting age population in HD 80 speaks Spanish at home.

**115.**   Under Plan H2316, the HCVAP in HD 80 falls to 77.6% (-8.6); 2020 General Election SSVR to 73.3% (-7.3); and 2020 General Election SSTO to 66.1% (-10.4).

**116.**   On information and belief, under Plan H2316, the most recent American Community Survey (ACS) data indicates that approximately 55.7% (-9.1) of the citizen voting age population in HD 80 would speak Spanish at home.

117.    The retrogressions in HD 80 make it substantially more difficult for the Latino and Spanish language communities, particularly substantial communities in Webb, Dimmit, and Zavala Counties, to elect the candidates of their choice. It turns HD 80 from a consistently performing district into a marginally performing district. It does so primarily by adding Atascosa County, SSTO of only 46.4%, to the district. It is possible to draw HD 80 in a way which keeps it consistently performing without injuring other districts in the area, and the Legislature was presented with opportunities to do so.

118.    Although Plan H2316 would not make HD 80 unwinnable by the Latino/Spanish language community candidate of choice, when taken together with the elimination of HD 76 in El Paso and the extreme retrogression of HD 31 and HD 37, the overall effect of H2316 is to unnaturally dilute the voting power of Latino and Spanish language communities along the border. Although, in large part due to a widely acknowledged undercount, some shifting of districts in the region is necessary, these changes would *at most* lead to slightly altering the performance of *one* opportunity district, not eliminating or severely weakening *four* performing opportunity districts.

### e. Texas House District 90 dilutes the ability of Latinos to elect the candidate of their choice in Primary Elections in Tarrant County

119.    Texas House District 90 has a history of legal complications from the last redistricting cycle.

120.    As recently as 2018, the United States Supreme Court found that the district had been unconstitutionally racially gerrymandered by the Texas Legislature when it redrew maps in 2013. *Abbott v. Perez*, 138 S. Ct. 2305, 2335 (2018). The purpose of the impermissible gerrymander was to keep certain non-Latino communities in HD 90 to increase the ability of the Anglo incumbent at the time to win Democratic primary elections in the district while superficially meeting certain demographic metrics.

121.    Natural demographic trends have resulted in the Hispanic Citizen Voting Age Population in HD 90 increasing dramatically over the course of the decade and the district becoming a reliable Latino opportunity district in both primary and general elections.

122.    Under Plan H2316, the Legislature has dramatically reduced Latino voting power in the district, weakening the ability of Latino voters in the area to elect the candidate of their choice in Democratic primary elections.

123.    Under the benchmark, HD 90 is 58.6% HCVAP; had 2020 General Election SSVR of 50.8%; had 2020 General Election SSTO of 48.1%; 2020 Democratic Primary SSVR of 51.0%; and 2020 Democratic Primary SSTO of 44.3%.

124.    Under Plan H2316, HD 90 would be 49.2% HCVAP (-9.4); would have 2020 General Election SSVR of 41.8% (-9); would have 2020 General Election SSTO of 37.9% (-10.2); 2020 Democratic Primary SSVR of 41.8% (-9.2); and 2020 Democratic Primary SSVR of 33.4% (-10.9).

125.    These changes were unnecessary and split apart communities of interest. Alternative proposals exist and were presented to the Legislature which would have brought HD 90 within acceptable population deviation limits while only making minor alterations to its structure.

### f.  Texas House District 118 was redrawn to dilute the voting power of Latinos in what is otherwise a performing Latino opportunity district.

126.    HD 118 is currently a performing Latino opportunity district. Proposals for HD 118 from the Bexar County delegation of Texas House members would have kept it as such, and Plan H2176 (the plan voted out of the House Redistricting Committee) would have slightly weakened the performance of HD 118, but likely still kept it a performing Latino opportunity district.

127.    However, Plan H2228, a floor amendment to HD 118 offered by Rep. Jacey Jetton (whose district is in Fort Bend, not Bexar County), was adopted over objections from the Bexar County

delegation, which severely dilutes the voting power of Latinos in the district by extending the district from the far Southwestern corner of Bexar County to wrap all the way to the most Northeastern corner of the County, taking in predominantly Anglo areas in that corner.

**128.**　Under the benchmark plan, HD 118 is 68.2% HCVAP; had 2020 General Election SSVR of 59.5%; and 2020 General Election SSTO of 55.7%.

**129.**　Under Plan H2316 (which incorporates the Jetton amendment), HD 118 would be 56.4% HCVAP (-11.8); would have had 2020 General Election SSVR of 47.6 % (-11.9); and would have had 2020 General Election SSTO of 43.9% (-11.8).

**130.**　These changes were made with the purpose and effect of preventing Latinos in HD 118 and surrounding areas from being able to consistently have an opportunity to elect candidates of their choice.

> **g.** **The arrangement of House districts in Harris County does not provide Latinos in the area with an equal opportunity to participate in the electoral process and elect candidates of their choice.**

**131.**　Under the benchmark plan, there are five (5) districts in Harris County which consistently perform to elect the Latino candidate of choice in primary and general elections, four (4) of which have majority HCVAP populations.

**132.**　According to the 2020 Census, there are 2,034,709 Latinos in Harris County, comprising 43% of the total population, and 29.9% of the citizen voting age population.

**133.**　Latinos accounted for 21.7% of the growth in Harris County over the last decade.

**134.**　Harris County is large enough to contain either 24 or 25 Texas House districts entirely within its boundaries. It currently contains 24, and the Legislature chose to leave that unchanged this decade. That means that, if one were working on a strictly proportional basis, Latinos should comprise a majority of the citizen voting age population in no fewer than 7 districts.

135.   Indeed, Latinos in Harris County are sufficiently numerous and geographically compact to form a majority of the citizen voting age population in at least seven (7) districts, as was demonstrated in plans presented before the Texas Legislature. Further, it is easy to draw five (5) majority HCVAP districts which stay within population deviation without changing the core shape of surrounding districts from the benchmark plan, and plans were presented which would have accomplished such. The Legislature was presented with plans which would have drawn additional majority HCVAP opportunity districts in Harris County, but leadership in the Texas House opposed the proposals.

136.   Rather than drawing a new Latino opportunity district, or even preserving existing ones, Plan H2316 actually took a step backwards and eliminated a performing Latino opportunity district while severely compromising another, weakening the ability of Latinos in those districts to elect candidates of choice in primary elections and providing no new opportunities in the County for Latinos to elect candidates of choice in either primary or general elections.

137.   Under the benchmark plan, HD 145 is 61.3% HCVAP; had 2020 General Election SSVR of 53.9%; 2020 General Election SSTO of 50.4%; 2020 Democratic Primary SSVR of 54.4%; and 2020 Democratic Primary SSTO of 46.4%.

138.   Under Plan H2316, HD 145 would be 55.7% HCVAP (-5.6); would have had 2020 General Election SSVR of 45.3% (-8.6); 2020 General Election SSTO of 39.3% (-11.1); 2020 Democratic Primary SSVR of 46.3% (-8.1); and 2020 Democratic Primary SSTO of 32.6% (-13.8).

139.   Under the benchmark plan, HD 148 is 45.5% HCVAP; had 2020 General Election SSVR of 36.1%; 2020 General Election SSTO of 30.1%; 2020 Democratic Primary SSVR of 36.9%; and 2020 Democratic Primary SSTO of 25.8%.

140.   Under Plan H2316, HD 148 would be 37.7% HCVAP (-7.8); would have had 2020 General

Election SSVR of 32.4% (-3.7); 2020 General Election SSTO of 28.9% (-1.2); 2020 Democratic

Primary SSVR of 32.4%(-4.5); and 2020 Democratic Primary SSTO of 26.0% (+.2).

**141.**   The configuration of Texas House districts in Harris County under Plan H2316 does not

provide Latinos in the county with an equal opportunity to participate in the political process and

elect candidates of their choice for the Texas House. In addition to HDs 145 and 148 being

restored, the Voting Rights Act requires drawing at least one additional majority HCVAP district

in Harris County.

> **h.   Additional Latino opportunity districts should be drawn in West Texas, Central Texas, and the Nueces County region.**

**142.**   Latinos in Odessa and surrounding West Texas areas are sufficiently numerous and

geographically compact to comprise a majority of the eligible voter population in at least one

single member district.

**143.**   Latinos in Central Texas, in regions between Bexar and Travis Counties, are sufficiently

numerous and geographically compact to comprise a majority of the eligible voter population in

at least one single member district.

**144.**   Plan H2316 reduces the HCVAP in HD 32 from 50.6% down to 42.0%. This reduction is

unnecessary, and a Latino opportunity district could be drawn in the region while maintaining the

same number of existing Latino opportunity districts in South Texas.

**145.**   Under Plan H2316, Anglo bloc voting in these areas prevents Latinos from electing the

candidates of their choice in primary or general elections.

> **2.   Congressional Districts Plan C2193 is discriminatory.**

> > **a.   Congressional District 23 is drawn to dilute the voting power of Latino and Spanish language communities in El Paso, along the border, and in parts of Bexar County.**

**146.**   CD 23 has been a repeated target of the Texas legislature for Latino vote dilution, and

courts have had to repeatedly step in to remedy the district.

147.    In 2006, following an off-cycle redistricting by the Texas legislature in 2003, the United States Supreme Court held that CD 23 was drawn in a way that diluted Latino voting power in violation of Section 2 of the Voting Rights Act. The district was subsequently redrawn by a federal district court for the remainder of that decade to remedy this violation.

148.    The 2006 Court pointed to the fact that the Latino population was reduced in the 2003 map so as to constitute less than a majority of the citizen voting age population of the district.

149.    In 2011, after the 2010 decennial Census, the Texas legislature again redrew CD 23 in a way which was found to violate the Voting Rights Act and to be part of a Congressional Plan which was drawn to intentionally discriminate against non-Anglos.

150.    In analyzing the Legislature's 2011 redrawing of CD 23, a federal three-judge panel found that the State had systematically removed high turnout Latino areas from the district and replaced them with low turnout areas to minimize the ability of Latinos to elect candidates of their choice while superficially maintaining the district at over 58% Hispanic Citizen Voting Age Population (HCVAP). "The[se] changes were enough to "nudge" a district that was an ability district, but barely so, to a nonperforming district." *Texas v. United States*, 887 F. Supp. 2d 133, 155 (D.D.C. 2012), *vacated and remanded on other grounds*, 570 U.S. 928 (2013).

151.    Because the 2011 Congressional Plan failed to gain preclearance under Section 5 of the Voting Rights Act at that time, CD 23 was redrawn ahead of the 2012 election by a three-judge panel and has remained in that configuration for the rest of the decade.

152.    In re-examining the configuration of CD 23 in 2017, a three-judge panel found that the district as drawn did not violate Section 2 of the Voting Rights Act, and that it provided Latinos in the district with an ability to elect candidates of choice. In reaching this conclusion, the court

looked at election results from the 2012, 2014, and 2016 cycles, in which the Latino-preferred candidate won one election and was closely competitive in the other two, and the fact that "[w]hen the current configuration of CD23 was adopted, the HCVAP was 61.3%, an increase from 58.5% HCVAP in the 2011 plan. The most recently available ACS five-year survey data (2011–2015) places the HCVAP at 62.1%[, and the] SSVR in CD23 was stable across all three elections for which C235 has been in place: 55.6, 55.9, and 55.3%, respectively." *Perez v. Abbott*, 274 F. Supp. 3d 624, 679 (W.D. Tex. 2017), *rev'd and remanded on other grounds*, 138 S. Ct. 2305 (2018).

153.   CD 23 in its current configuration (the benchmark plan) using the most recent data is 63.2% HCVAP; had 54.1% Spanish Surname Voter Registration in 2020 the 2020 General Election; had 47.8% Spanish Surname Turnout in the 2020 General Election; and approximately 53.8% of the voting age population in the district speaks Spanish at home.

154.   Plan C2193 reduces the HCVAP in CD 23 to 57.8% (-5.4%); the SSVR for 2020 to 49.2% (-4.9%); the SSTO for 2020 to 42.9% (-4.9%); and the approximate percentage of the voting age population who speak Spanish at home down to 49.6% (-4.2%).

155.   Latinos and Spanish speakers are sufficiently numerous and compact to form an effective majority of the voting population in a single member district in the area and to overcome Anglo block voting to elect a candidate of their choice.

   **b.   By pairing lower turnout Latino and Spanish language communities in South Texas, where the effects of historical and current barriers to participation are notable, with higher turnout areas that have extreme Anglo bloc voting, CD 15 dilutes the voting power of Latino and Spanish language voters, while CD 27 dilutes the voting power of Latino and Spanish language voters in Nueces County.**

156.   In both its current form and under Plan C2193, Congressional District 15 unnecessarily dilutes the voting power of Latino and Spanish language voters in South Texas by pairing them with extreme Anglo bloc voting counties even further north than Bexar.

**157.** Plan C2193 makes this dilution worse by losing the heavily Latino and Spanish speaking communities of Jim Hogg and Duval Counties (92.0% and 88.3% HCVAP respectively; on information and belief, approximately 75.5% and 61.2% of CVAP speaks Spanish at home) while bringing in more population from Wilson County (36.7% HCVAP; on information and belief, approximately 18.8% of CVAP speaks Spanish at home), which has extremely high and cohesive Anglo bloc voting.

**158.** On information and belief, under Plan C2193, the most recent American Community Survey (ACS) data indicates that only a very bare majority (approximately 53.0%) of the citizen voting age population in CD 15 speaks Spanish at home.

**159.** Nueces County is 59.6% HCVAP and, on information and belief, approximately 34.8% of the citizen voting age population speaks Spanish at home. The western portion of Nueces County is even more highly concentrated—the current HD 34, for instance, is 69.4% HCVAP and, on information and belief, approximately 42.8% of the citizen voting age population speaks Spanish at home. In both the benchmark plan and Plan C2193, Nueces County is paired with heavily Anglo counties with extreme bloc voting as far North and inland as Bastrop to form a district which is below 49% HCVAP and in which only approximately 22% of the citizen voting age population speaks Spanish at home.

**160.** A district configuration which puts some or all of Nueces County into CD 15 and Central Texas counties such as Wilson, Guadalupe, and Karnes into CD 27—or a district configuration which puts some or all of Nueces County into CD 34 while putting more of Hidalgo County into CD 15 and the Central Texas counties into CD 27—would provide Latino and Spanish language communities in CD 15 and Nueces County with a more equal opportunity to elect candidates of their choice. Such a district configuration would also be more geographically compact and keep

intact more communities of interest than the current configuration.

### c. The Voting Rights Act requires drawing a Latino opportunity district in the DFW Metroplex.

161.   Latinos accounted for over 50% of the growth in Dallas and Tarrant Counties in the last decade. Despite this, Plan C2193 gives no new representation to Latinos in the area. Instead, it goes to extreme lengths to crack Latino communities in the area. CD 6, for example, slices down the middle of Arlington and cuts in half cohesive Latino communities in Grand Prairie and Irving, taking portions of these communities and pairing them with distant rural counties as far East as Cherokee County. Meanwhile, CD 33 cuts through Irving and winds all the way around CD 6 to come back into Grand Prairie, slicing through Latino communities along the way.

162.   Latinos in Dallas and Tarrant County are sufficiently numerous and compact to constitute a majority of the eligible voter population in a new district while maintaining the current Dallas and Tarrant anchored congressional districts which exist. Plans were presented to the Legislature which would have done so, but they were not adopted.

### d. The Voting Rights Act requires drawing an additional Latino opportunity district in Harris County.

163.   The current configuration of Congressional districts in Harris County artificially and unnecessarily packs Latino voters into CD 29 (62.2% HCVAP), while the rest of the Latino communities in Harris County are split between numerous districts. Given voting patterns in the County, CD 29 would continue to perform to elect the Latino candidate of choice in primary and general elections with less of a concentration of Latino voters.

164.   Latinos in Harris County are sufficiently numerous and geographically compact to form a majority of the eligible voter population in a second district wholly contained within Harris

County. Plans were presented to the Legislature which would have done so, but they were not adopted.

### 3. State Board of Education Plan E2106 is discriminatory.

#### a. Latino voting power in State Board of Education Districts 2 and 3 is severely diluted despite it being possible to increase the performance of both of these existing Latino opportunity districts while also making them more geographically compact and providing representation for Latinos in Central Texas.

165.   Despite accounting for 30% of the citizen voting age population, Latinos only account for a majority of the citizen voting age population in 3 out 15 SBOE Districts (20%). Under Plan E2106, the performance of two out of three of the existing Latino opportunity districts is at best marginal when it comes to electing candidates of choice. This is a result of bringing in distant, predominantly Anglo counties such as Wilson, Dewitt, Lavaca, Goliad, and Jackson (all over 60% Anglo CVAP) where extreme bloc voting dilutes the voting power of Latinos in South Texas and Bexar County.

166.   Additionally, under Plan E2106, large populations of Latinos in Central Texas between Bexar and Travis County are not included in a district where they have an equal opportunity to elect candidates of their choice in primary elections, but rather are put into a heavily Anglo Democratic-leaning district.

#### b. The Voting Rights Act requires drawing a new Latino opportunity SBOE District in Harris County

167.   Harris County and Fort Bend County have a total population of over 5.5 million people (enough for nearly 3 wholly contained SBOE districts) which is 70% non-Anglo. Communities of color accounted for 100% of the new growth in these counties last decade, with the Anglo population in Fort Bend County decreasing by 4.8%, and the Anglo population in Harris County decreasing by 25.8%. Despite this, Plan E2106 only provides the region with a single CVAP

majority minority SBOE District (SBOE District 4) and diminishes minority representation in the region as compared to the benchmark plan.

168.    Under the benchmark, SBOE District 6 was on the verge of becoming a competitive district where a coalition of minorities had a meaningful opportunity to elect the candidate of their choice. Plan E2106 takes minority communities from District 6 and pairs them with the predominantly Anglo Montgomery County.

169.    Latinos are sufficiently numerous and geographically compact to form a majority of the eligible voters in a SBOE district wholly contained in Harris County while still maintaining SBOE District 4 in roughly its current form. Plans were presented to the Legislature which would have accomplished this, but they were not adopted.

**E.  There is significant racial and language-based polarization in the challenged districts.**

170.    On information and belief, voting is polarized between Anglo and Latino voters at levels which are legally significant in the regions described in paragraphs 86-169 above.

171.    On information and belief, voting is even further polarized as between Anglo and Spanish-language voters at levels which are legally significant in the regions described in paragraphs 86-169 above.

172.    Anglo bloc voting in the regions detailed in paragraphs 86-169 above is sufficient to prevent cohesive Latino and/or Spanish language voters from having an equal opportunity to elect the candidates of their choice in those regions under the adopted Plans.

**F.  Under the Totality of the Circumstances, The Political Process Is Not Equally Open to Latinos and Spanish Speakers in CD 23 and Surrounding Areas, and Intentional Racial Discrimination Is Evident.**

   **1.  Latinos are under-represented in the Texas House, Texas Senate, and Texas Congressional Delegation both in the benchmark plans and the newly enrolled plans.**

**173.**   Latinos make up approximately 30% of the Citizen Voting Age Population (CVAP) in Texas.

**174.**   Under Plan C2193, Latinos would only comprise a majority of the CVAP in 7 out of 38 districts (18.4%), falling over 4 seats short of proportional representation.

**175.**   Under the recently enacted plan for the Texas House of Representatives, Latinos would only comprise a majority of the CVAP in 30 out of 150 districts (20%), falling 15 seats short of proportional representation.

**176.**   Under the recently enacted plan for the Texas State Senate, Latinos would only comprise a majority of the CVAP in 7 out of 31 districts (22.6%), falling over 2 seats short of proportional representation.

**177.**   Under the recently enacted plan for the Texas State Board of Education, Latinos would only comprise a majority of the CVAP in 3 out of 15 districts (20%), falling over 1 seat short of proportional representation.

**178.**   It is geographically possible for Latinos to comprise a reasonably compact majority of the CVAP in at least 10 Congressional Districts, 43 Texas House Districts, 9 Texas Senate Districts, and 4 State Board of Education Districts.

**179.**   On the whole, this severe and systematic under-representation has the effect of denying Latinos an equal opportunity as Anglos to engage in the political process and suggests an intent to produce such an effect.

**180.**   While reducing Latino and Spanish language opportunities for representation, both Plan C2193 and Plan E2106 increase the number of Anglo majority Democratic districts.

**2. Texas has a long and unfortunate history of intentional discrimination and Voting Rights Act violations, and continues to enforce laws and administer elections in ways that deprive Latinos and Spanish speakers of an equal opportunity to participate.**

**181.** In addition to the redistricting-specific violations detailed in Paragraphs 86-169 above, official racial discrimination in the electoral process in Texas dates back to the formation of the State.

**182.** In the early Republic, Mexicans were prohibited from organizing political rallies or serving as election judges. Lichtman Report, *supra* at 9.

**183.** "After the Civil War, in 1866, an all-white constitutional convention prohibited freed slaves from voting, holding office, or serving on juries." *Id.* at 18.

**184.** Texas instituted post-Reconstruction Jim Crow laws such as the poll tax, racial gerrymandering, restrictive voter registration laws, and the all-white Democratic primary, to prevent minorities from participating in the political process. *Id.* The U.S. Supreme Court struck down Texas's white primaries as violations of the Fifteenth Amendment in *Nixon v. Herndon*, 273 U.S. 536 (1927), and *Smith v. Allwright*, 321 U.S. 649 (1944).

**185.** In the 1964 election, Republican operatives circulated false information in Black neighborhoods in Houston indicating that authorities could arrest voters who had an outstanding parking ticket or traffic conviction. Lichtman Report at 18-19. Similar tactics were deployed throughout the decades in South Texas to discourage Latinos from voting. *See* Texas Civil Rights Project, *Opening the Floodgates for Racial Intimidation, Disenfranchisement, and Violence by Expanding Poll Watcher Authority* (2018), https://txcivilrights.org/wp-content/uploads/2021/05/TCRP-Poll-Watcher-Report.pdf.

**186.** After Texas's poll tax was struck down as unconstitutional in 1966, Texas passed a new law requiring voters to re-register every year. The law had a substantial disenfranchising effect

on minority voters and was struck down as unconstitutional in 1974. *Beare v. Briscoe*, 498 F.2d 244, 247–48 (5th Cir. 1974).

**187.**   A federal court found that the 2011 Texas Legislature passed SB 14, a voter ID law, with racially discriminatory intent. *See Veasey v. Perry*, 71 F. Supp. 3d 627, 702-03 (W.D. Tex. 2014) ("*Veasey I*"); *Veasey v. Abbott*, 249 F. Supp. 3d 868, 875-76 (S.D. Tex. 2017) ("*Veasey III*"). SB14 has been deemed among the most restrictive voter ID laws in the country.

**188.**   "Minorities continue to have to overcome fear and intimidation when they vote," including in-person harassment at the polls to suppress minority participation. *Veasey I* at 71 F. Supp. 3d at 636-37; *see also Rodriguez v. Harris Cnty.*, 964 F. Supp. 2d 686, 783 (S.D. Tex. 2013) (describing poll workers being hostile to Latinos, depriving them of the opportunity to bring an assistant with them, and requiring them to show driver's licenses to vote even before Texas made that a legal requirement).

**189.**   In 2016, the Fifth Circuit held that a Texas law limiting who could provide foreign-language voters with assistance violated the Voting Rights Act. *OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017).

**190.**   Numerous counties in CD 23 and throughout the state have failed to provide adequate Spanish language voting materials and information, in apparent violation of the Voting Rights Act, including at least as recently as 2016.

**191.**   In 2019, the Texas Secretary of State attempted to purge nearly 100,000 registered voters from the voter rolls despite being made aware that the process for identifying voters for removal targeted eligible voters who were naturalized citizens. *Tex. League of United Latin Am. Citizens v. Whitley,* CV SA-19-CA-074-FB, 2019 WL 7938511, at *2 (W.D. Tex. Feb. 27, 2019). The individuals who were affected by this attempted purge were overwhelmingly non-Anglo, and

mostly of Latino origin. A court had to enjoin the State from proceeding with this purge, *id.*, and ultimately the State settled the matter.

192.    Since the end of preclearance under the Voting Rights Act, Texas has led the nation in polling place closures. During the 2020 General Election, a Bexar County District Court Judge enjoined the County from further closing polling places because "the additional closure of polling locations in 2020 will negatively impact African American and Hispanic voters in those precincts." Order, *Texas Organizing Project v. Callanen*, NO. 2020-CI-19387 (Bexar County 45th Judicial District October 13, 2020).

193.    During the 87th Regular and Special Sessions, the Legislature repeatedly tried, and ultimately after much debate and controversy succeeded, in passing a new law, S.B. 1, 2021 87th Leg., 2d Spec. Sess. (Tex. 2021). Senate Bill 1 imposes numerous restrictions on the right to vote in spite of demonstrably disparate impacts on communities of color and foreign language voters. These new measures include making the process for receiving language assistance for in person and mail ballot voting significantly more onerous, restricting who can provide language assistance for voters, eliminating voting practices which have been disproportionately utilized by minority voters, such as extended hours and drive-thru voting, severely limiting Sunday voting hours which would curtail the historical African American practice of post-church "souls to the polls" mobilization, increasing the authority of poll watchers to interfere with voters and the election process despite evidence of racial targeting and intimidation. There is pending litigation over the Bill.

      **3.   The Texas Legislature is not redistricting in a vacuum, and the racial dynamics of modern political appeals villainizing Latinos, and intimidation tactics meant to discourage their participation, have proliferated in recent years.**

194.    Increasingly in recent years, politics have become racialized, particularly when it comes to

communities which have large immigrant populations—namely Latino and AAPI communities. Although immigration debates naturally have a racial and ethnic component, the political messaging around the issues has unnecessarily inflamed racial resentment, such as using stock imagery of brown-skinned individuals with tattoos or in rafts to raise the specter of an "illegal invasion."

195.   Lieutenant Governor Dan Patrick has repeatedly publicly echoed a white supremacist conspiracy theory, "the Great Replacement theory," that non-Anglo undocumented immigrants are being ushered into the United States so that they can eventually help Democrats win elections.

196.   Then-candidate Donald Trump infamously started his campaign with comments which were widely regarded as stirring up anti-Latino sentiment, stating: "When Mexico sends its people, they're not sending their best.  . . . They're sending people that have lots of problems, and they're bringing those problems with us [sic]. They're bringing drugs. They're bringing crime. They're rapists. And some, I assume, are good people."

197.   Then-candidate Trump argued in 2016 that Judge Gonzalo Curiel — who was overseeing a lawsuit involving one of Donald Trump's business ventures — should recuse himself from the case because of his Mexican heritage and membership in a Latino lawyers association, implying that Latinos and immigrants are one and the same and incapable of unbiased legal reasoning.

198.   President Trump tweeted that several minority members of Congress — Reps. Alexandria Ocasio-Cortez (D-NY), Ayanna Pressley (D-MA), Ilhan Omar (D-MN), and Rashida Tlaib (D-MI) — are "from countries whose governments are a complete and total catastrophe" and that they should "go back" to those countries. This echoed a common racist trope of saying that Black and Brown people, particularly immigrants, should go back to their countries of origin. Three of the four members of Congress whom Trump targeted were born in the US.

199.    October 16, 2018 America First Action sponsored a Facebook ad alleging that candidate Colin Allred "is essentially extending an open invitation to not only the 11 million illegal immigrants already in the United States, but also to those who haven't gotten here, yet."  The ad featured stock images of Brown-skinned individuals in rafts, equating Latinos with an illegal invasion of the country.

200.    September 19, 2018 Ted Cruz posted a video on Twitter that highlighted three undocumented immigrants from Latin America who were convicted of violent crimes, but no immigrants from any other regions or races.

201.    In the 2020 race for Galveston County Tax Assessor, one candidate sent a mailer with a stock image of a Latino man with a tattooed face and tattooed bare chest, standing arms crossed. The words accompanying the photo are meant to create fear about the man and what he represents: "Texans can thank Cheryl Johnson for having illegal immigrants vote in this November's Election!"

202.    A paid social media ad from the Donald Trump war room account featured stock photos of brown-skinned men with tattoos and the phrase "I'm on Team Joe," villainizing Latinos and implying that Latino gang members support Joe Biden.

203.    President Trump called the SARS-CoV-2 coronavirus the "Chinese virus" and "kung flu" — racist terms that tap into xenophobia.

204.    Texas Congressman Jodey Arrington posted a paid social media ad calling to hold China accountable for coronavirus.

205.    Members of the Texas Senate called into question a research paper on the Coronavirus because its co-authors included two individuals with Asian surnames, despite the fact that they were affiliated with Texas A&M University.

206.   Texas Agriculture Commissioner Sid Miller has been repeatedly noted as posting anti-Semitic tropes on social media.

207.   Not only has this rhetoric led to racial polarization in the electorate, it has led to actual physical violence against Latinos, Asians, and non-English speakers, and been openly lauded by white supremacists. Richard Spencer, a leader of the alt-right movement and the 2017 Charlottesville Unite the Right rally which ended in violence, has stated: "There is no question that Charlottesville wouldn't have occurred without Trump. It really was because of his campaign and this new potential for a nationalist candidate who was resonating with the public in a very intense way. The alt-right found something in Trump. He changed the paradigm and made this kind of public presence of the alt-right possible."

208.   David Duke, a former Ku Klux Klan leader, who participated in the Charlottesville rally, called the rally a "turning point" for his own movement, which seeks to "fulfill the promises of Donald Trump."

209.   On August 3, 2019, a man from Allen, Texas drove to El Paso for the express purpose of killing Latinos and proceeded to kill 23 and injure 23 others. The shooter, echoing the same Great Replacement theory referenced above, wrote prior to the shooting: "The heavy Hispanic population in Texas will make us a Democrat stronghold," he wrote. "Losing Texas and a few other states with heavy Hispanic population to the Democrats is all it would take for them to win nearly every presidential election."

210.   Incidents of Anti-Asian violence have proliferated in the last two years. In Texas, these have included stabbings and vandalism.

211.   Latino and foreign-language voters have faced intimidation and baseless challenges to their voter registrations at the polls in recent years, including poll watchers and third-parties

questioning Latino and Asian-appearing voters and attempting to investigate their identification documents.

212.   In the 2018 General Election, the Fort Bend Republican Party published an ad in the India Herald in advance of the local Hindu community's annual festival.  It featured the Hindu god Ganesha, who is depicted in the form of an elephant, and reads, "Would you worship an elephant or a donkey?"

213.   October 16, 2018, America First Action sponsored a Facebook ad against candidate Colin Allred, claiming that he did not support the Second Amendment.  The ad includes a picture of a white woman with a hand over her face appearing to belong to a person of color. Representative Allred's name appears above the image. Another picture shows a white woman engaged in target practice with a handgun, with Representative Pete Sessions's name above it.

214.   The Miami Herald reported that the National Republican Congressional Committee appeared to have darkened a photograph of NFL quarterback Colin Kaepernick that it had purchased from the Herald, which it then disseminated in a fundraising mailer.

215.   Most recently, Texas Lieutenant Governor Dan Patrick made headlines for stating that African Americans were disproportionately responsible for the spread of Coronavirus and equating African Americans with Democrats in order to then blame the spread on Democrats.

> **4.  The Texas legislature applied traditional redistricting principles unequally -- employing them only when it was useful to protect the interests of Anglo majority communities and incumbents.**

216.   Amendments offered on the grounds of preserving communities of interest were accepted when the communities being protected were Anglo majority, but similar concerns about splitting minority communities were ignored. For example, an amendment to Plan H2316 was accepted in the House Committee on the grounds that it preserved the communities of Belton and Temple in

Bell County—both majority Anglo—yet when amendments were offered which would have preserved both the Belton/Temple communities and the majority minority community of Killeen in Western Bell County, the amendments were not accepted.

217.   When an amendment was offered by a legislator which would have created new minority opportunity districts but affected other members' districts without their consent, those amendments were rejected on the grounds that they affected other members' districts. When amendments were offered which weakened minority opportunity districts and affected other members' districts without their consent, those amendments were accepted over the objections of the affected members.

218.   Population deviations in Plan H2316 were severely manipulated in West Texas to overpopulate every Latino opportunity district and underpopulate every Anglo controlled district, as detailed in Paragraphs 87-102 above. These deviation manipulations are particularly egregious when one takes into account how prison populations are counted in Texas. Despite not counting prisoners as residents of their prison facility for any other legal purpose—for instance redistricting of county and local political subdivisions, voter registration, residence for taxation purposes—Texas still counts prisoners at their facility for purposes of allocating population in the redistricting context. The Texas prison population is disproportionately non-Anglo. On information and belief, at least 3 Anglo majority West Texas districts would not be large enough to fall within the acceptable population deviation were it not for their sizable non-voting, majority minority prison populations.

219.   Texas's County Line Rule, articulated in Article III Section 26 of the Texas Constitution, was used as a reason to object to amendments which would have created new minority opportunity districts. Yet Plan H2316 itself breaks county lines 19 times and clearly violates the

plain language of the County Line Rule in splitting Cameron County in two different directions.

**220.**   As detailed in Paragraph 77 above, minority members' concerns about insufficient time to review amendments were ignored, yet their own amendments were rejected on the grounds that there had been insufficient time to review them.

> **5.   The Legislature made race a predominant factor in the drawing of certain districts without a good faith effort to comply with the Voting Rights Act and without any other compelling governmental interest.**

**221.**   The shape and composition of many districts—in particular the Texas House, Congressional, and SBOE districts in Harris County, and the Congressional districts in the DFW metroplex—are inexplicable except on the grounds of race.

**222.**   Chairman Hunter repeatedly centered race in his explanations of proposed plans, but used inappropriate metrics in his assessment of their effects on minority communities. In his Committee layout of the Bill, he opened by stating:

> My view is that the correct analysis in reviewing majority minority districts is to look at African-American and Hispanic VAP, voting age population, which shows that the plan, as we call it, actually creates a new African-American districts, and 2 new Hispanic HVAP districts from the benchmark. . . . Some summary points: There's 3 new, under my bill, majority minority districts. There are 38 majority minority HVAP, Hispanic, districts versus 36 under the benchmark, that's plus 2. . . . then we have 2 majority minority African American districts versus 1 under the benchmark. and by the way, HD 111, an African-American majority district, it was 50.4% BVAP and due to the 2020 census, dropped to 47%. the bill before you has brought it back to 54.7%.

**223.**   Again in closing, he stated: "summary: 4 new majority minority districts, 3 Hispanic, 1 African-American."

**224.**   Then again on the House floor, Chair Hunter repeatedly emphasized the creation of new VAP majority minority districts and the propriety of considering VAP without being able to discuss details of any consideration of electoral performance or other substantive analysis. He did

this for both his own House plan as well as the Congressional and SBOE plans which originated in the Senate.

225.   Amendments were offered, and in some cases accepted, on the explicit grounds that they made districts hit certain arbitrary racial metrics without substantive analysis of if doing so was relevant to a Voting Rights Act violation.

226.   Amendments were rejected if they crossed certain arbitrary thresholds—for instance, lowering BVAP below 50%—without any substantive analysis of if the Voting Rights Act required maintaining these particular demographic metrics.

227.   SBOE District 6 is 50.3% non-Anglo VAP, just barely making it a majority minority district. Given the Legislature's improper focus on VAP, this raises the inference that the Legislature arbitrarily kept it at just over 50% non-Anglo VAP without any analysis of whether it would perform as a Voting Rights Act opportunity district.

228.   On information and belief, certain legislators from Harris County centered racial considerations in their drawing of proposed districts and amendments to Plan H2316, openly discussing these matters with other members of the delegation and House leadership, specifically focusing on the level of Anglo voting age population in particular districts which did not have Voting Rights Act implications.

229.   The shapes and interplay of Congressional Districts 6 and 33 are also inexplicable except on the grounds of race.

230.   An amendment which would have created a new, Voting Rights Act-compliant Latino opportunity district in Dallas County was rejected on the grounds that it lowered the Latino population in the coalition-type CD 33. No substantive analysis was provided as to why creating a new Latino majority district in Dallas County at the expense of slightly reducing the Latino

population in CD 33 presented a problem under the Voting Rights Act.

## V. Legal Claims

### Count I

*Intentional Racial Discrimination Violating the Fourteenth and Fifteenth Amendments to the United States Constitution*

**231.**    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**232.**    Texas House Plan H2316, Congressional Plan C2193, and SBOE Plan E2106 discriminate against Plaintiff on the basis of race and national origin in violation of the 14th and 15th Amendments to the U.S. Constitution.

### Count II
*Violations of Section 2 of the Voting Rights Act*

**233.**    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**234.**    Plaintiff's cause of action arises under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. Defendants are in violation of the Voting Rights Act because they have failed to provide sufficient Latino and minority opportunity districts in Texas House Plan H2316, Congressional Plan C2193, and SBOE Plan E2106 in the face of racial bloc voting; employed redistricting gerrymandering techniques such as packing and cracking of minority communities to limit and avoid drawing Latino and minority opportunity districts; used redistricting criteria, such as the "whole county" rule inconsistently and as an unjustifiable pretext to limit and avoid drawing Latino and minority opportunity districts; manipulated population deviations and leveraged a known undercount to further reduce electoral opportunities. Defendants' elimination and weakening of existing districts, failure to draw additional Latino and minority opportunity districts, use of racial gerrymandering techniques, pretextual and inconsistent use of traditional redistricting criteria, and manipulation of population data

collectively results in a violation of Plaintiff's rights as secured by Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.

**235.**   Taken together with the totality of the circumstances, Texas House Plan H2316, Congressional Plan C2193, and SBOE Plan E2106 do not afford plaintiff's members an equal opportunity to participate in the political process and to elect representatives of their choice, and deny plaintiff's members the right to vote in elections without distinction of race, color, or membership in a language minority group.

**Count III**
*Unconstitutional Racial Gerrymandering in Violation of the Fourteenth Amendment to the United States Constitution*

**236.**   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**237.**   The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution bars racial gerrymandering, or the "intentional[] assigning [of] citizens to a district on the basis of race without sufficient justification." *Shaw v. Reno*, 509 U.S. 630 (1993). Texas House Plan H2316, Congressional Plan 2193, and SBOE Plan E2106 violate these principles because races was a predominant factor in drawing the districts previously mentioned in Paragraphs 86-169. Despite some members of the Legislatures proclaiming that race was not a factor in the drawing of any redistricting maps, race appears to be the only factor that can explain many of the redistricting outcomes. When the Legislature explicitly relied on race in redistricting, it often did so under an incorrect legal understanding.

**238.**   In numerous instances, Texas violates traditional redistricting guidelines—such as compactness, contiguity, and preservation of political subdivisions and communities of interest—and the only explanation can be based on race.

**Count IV**

*Violation of the Fourteenth Amendment's One Person-One Vote Requirement*

**239.**   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

**240.**   The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution "requires that the seats in both houses of a bicameral state legislature [] be apportioned on a population basis." *Reynolds v. Sims*, 377 U.S. 533, 568 (1964). Although, in the context of state legislative districts, traditionally a deviation of up to 10% from the most underpopulated to the most overpopulated district has been afforded a presumption of constitutional validity, these deviations cannot be leveraged for impermissible purposes, including racial or even mere partisan advantages. *See Cox v. Larios*, 542 U.S. 947 (2004).

**241.**   Texas adopted House Plan H2316 and it was signed into law on October 25, 2021. House Plan H2316 has a total or "top to bottom" deviation of 9.98%. Defendants achieved this deviation by dramatically over-populating Latino majority districts and dramatically under-populating surrounding Anglo majority districts to eliminate Latino majority districts while preserving Anglo districts. For example, the configuration and systematic overpopulation of Texas House Districts in El Paso, in particular the consolidation of House Districts 76 and 77, dilutes the voting power of cohesive Latino communities. There is no legal justification for maintaining a deviation of 9.98% for these purposes. The deviation in House Plan H2316 violates the one person, one vote principle of the Fourteenth Amendment of the U.S. Constitution.

**VI. Prayer for Relief**

**WHEREFORE**, Plaintiff respectfully requests that this Court:

    a.   Declare that House Bill 1, Senate Bill 6, and Senate Bill 7 violate Section 2 of the Voting Rights Act as to the districts and regions described in this Complaint;

b.   Declare that House Bill 1, Senate Bill 6, and Senate Bill 7 are unconstitutional and violate the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment because they were drawn with racially discriminatory intent;

c.   Declare that House Bill 1, Senate Bill 6, and Senate Bill 7 violate the Fourteenth Amendment's one person-one vote principle by manipulating population deviations for impermissible purposes as described in this Complaint;

d.   Declare that House Bill 1, Senate Bill 6, and Senate Bill 7 violate the Fourteenth and Fifteenth Amendment by making race a predominant factor in the drawing of certain districts without a compelling justification for doing so;

e.   Permanently enjoin Defendants from calling, holding, supervising or certifying any elections under Texas House Plan H2316, Congressional Plan C2193, and SBOE Plan E2106. Plaintiff has no adequate remedy at law other than the judicial relief sought herein, and unless the Defendants are enjoined from using the foregoing plans, plaintiff and plaintiff's members will be irreparably harmed by the continued violation of their statutory and constitutional rights;

f.   Set a reasonable deadline for state authorities to enact or adopt redistrict plans for Texas House, Congress and SBOE that do not dilute, cancel out, or minimize the voting strength of Latino voters;

g.   If state authorities fail to enact or adopt valid redistricting plans by the Court's deadline, order new redistricting plans for Texas House, Congress and SBOE that do not dilute, cancel out or minimize the voting strength of Latino voters;

h.   Adjudge all costs against Defendants, including reasonable attorneys' fees;

i.   Retain jurisdiction to render any and all further orders that this Court may enter; and

j.   Grant any and all further relief to which Plaintiff may show itself to be entitled.

Dated:  November 3, 2021.

Respectfully submitted,

SOMMERMAN, MCCAFFITY, QUESADA &GEISLER, L.L.P.

*/s/ George (Tex) Quesada*

George (Tex) Quesada
State Bar No. 16427750
Email:  quesada@textrial.com

Sean J. McCaffity
State Bar No. 24013122
Email:  smccaffity@textrial.com

3811 Turtle Creek Boulevard, Suite 1400
Dallas, Texas  75219-4461
214/720-0720 (Telephone)
214/720-0184 (Facsimile)

-and-

Joaquin Gonzalez
Texas Bar No. 24109935
1055 Sutton Dr.
San Antonio, TX  78228
jgonzalez@malc.org

***ATTORNEYS FOR PLAINTIFFS***

ORIGINAL COMPLAINT - 54